NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

14-P-796                                        Appeals Court


BRIAN M. TOUHER[1] & others[2] vs.  TOWN OF ESSEX.


No. 14-P-796.

Essex.     March 24, 2015. - August 10, 2015.

Present:  Kantrowitz, Blake, & Massing, JJ.


Real Property, Lease.  Contract, Lease of real estate, Unjust
     enrichment.  Personal Property, Ownership.  Landlord and
     Tenant, Fixture.  Unjust Enrichment.



     Civil action commenced in the Superior Court Department on
May 11, 2012.

     The case was heard by Richard E. Welch, III, J., and
motions to alter or amend the judgment and for a new trial or to
amend the judgment were considered by him.


     Christopher Weld, Jr. (Suzanne Elovecky with him) for the
plaintiffs.
     Gregg J. Corbo for the defendant.

---

[1] During the pendency of this appeal, a suggestion of death
was filed as to Paul Touher, and we allowed the plaintiffs'
assented-to motion to substitute Brian M. Touher in his capacity
as personal representative of the estate of Paul Touher.

[2] Sarah Wendell and David R. Wendell, Jr., as trustees of
the David R. Wendell 1993 Revocable Trust.

MASSING, J.  This appeal arises from a series of disputes between the seasonal residents of Conomo Point and the town of Essex (town), which owns and rents them the land on which they reside.  Four sets of plaintiff residents filed a complaint seeking a declaration that they owned the buildings they had erected on the town's land.  After a jury-waived trial, a Superior Court judge entered a declaration that two sets of plaintiffs owned their cottages as personal property, but that the more substantial homes that the two other sets of plaintiffs had built were fixtures that belonged to the town.  The latter -- the decedent Paul Touher (Touher), and Sarah Wendell and David R. Wendell, Jr., as trustees of the David R. Wendell 1993 Revocable Trust (the Wendell Trust) (collectively, plaintiffs) -- appeal from that judgment, as well as the judge's posttrial decision that they had no equitable claim against the town to recover the value of the houses.[3]  Largely for the reasons that the trial judge set forth in his detailed memorandum and order, we affirm.

Background.  1.  Historical perspective.  For more than one century, the town has been leasing desirable plots of waterfront

---

[3] In a second case, a certified class of plaintiff leaseholders, including the Wendell Trust and Touher, challenged the town's assessment of the fair market value for them to rent their land on Conomo Point.  The judge decided that matter in favor of the town, and the plaintiffs appealed.  The issues are addressed in a memorandum and order pursuant to our rule 1:28 issued this same day.  Walker v. Essex, post  (2015).

or near-waterfront property on Conomo Point -- once the location of the town's "poor farm" -- to seasonal residents. The lessees, at their own expense, built seasonal cottages on these properties. In addition to the rent they paid to lease the land, the residents were assessed and paid real estate taxes on the cottages.

At various times the town[4] has sought to alter its economic relationship with the Conomo Point residents. In 1987, the town took steps to increase the rental rates for the properties. These efforts led to a class action suit in the Land Court (the Pingree case[5]) that settled in 1991 with an agreement regarding the rental rates, which was incorporated into a set of new ten-year leases, each with a ten-year renewal option (the Pingree leases). Two decades later, as the expiration of the Pingree leases approached, the town sought to sever completely its relationship with the Conomo Point residents. While the town was considering a long-term plan for Conomo Point, however, it decided to offer the residents short-term bridge leases, allowing them to remain on the property for as many as five more years.

---

[4] The town by-laws establish a Conomo Point Commission (commission), composed of the members of the town's board of selectmen, to manage the Conomo Point properties. We refer to the commission and the town interchangeably.

[5] Pingree vs. Essex, Land Ct., No. 124-199.

To that end, the town successfully pursued a special act of the Legislature to allow it to enter into bridge leases with the residents, without the need to comply with the formal bidding process mandated by G. L. c. 30B, § 16. On May 2, 2011, "An Act Authorizing the Lease of Certain Property at Conomo Point in the town of Essex," reprinted in full in the margin,[6] went into effect, authorizing the town to "lease for 5 years or less all or any portion of its property known as Conomo Point, at fair market value" and, if it so elected, to grant "a certain level

---

[6] "SECTION 1. Notwithstanding section 16 of chapter 30B of the General Laws or any other general or special law to the contrary, the town of Essex, if first authorized by a vote of its town meeting, may lease for 5 years or less all or any portion of its property known as Conomo Point, at fair market value, upon such terms and conditions as the board of selectmen deems appropriate, in accordance with a bylaw adopted by town meeting, which bylaw shall ensure that such leases shall be undertaken in accordance with an open, fair and competitive process, using sound business practices and principles of fair dealing, which process may, but need not, recognize as a criteria for evaluation for any such lease a certain level of preference for current [lessees] of the property.

"SECTION 2. This act shall not exempt the town of Essex from sections 3, 15 or 15A of chapter 40 of the General Laws, sections 2-13.4 and 2-13.11 of the town bylaws or any other general or special law which requires a vote of town meeting to authorize the lease of real property.

"SECTION 3. This act shall take effect upon its passage." St. 2011, c. 17.

The 2011 legislation used the word "leases," not "lessees." In 2012, substantially similar legislation was adopted, with the only difference being substitution of the word "lessees" for the word "leases." St. 2012, c. 104, § 1.

of preference for current [lessees] of the property."  St. 2011, c. 17, § 1.

In anticipation of, and then following, the adoption of the legislation, the town entered into discussions with representatives of the residents.  As part of this process, the town issued a request for proposals, drafted with the residents' input, for an appraiser to determine the fair market value of the leases.  Dissatisfied with the results of his report, the resident group hired its own appraiser.  After exchanging appraisals and further negotiations, the town offered the residents one-year leases for calendar year 2012, with a town option to extend the leases for up to four one-year periods. The leases included phased-in rent increases for the first three years, with the rent for the remaining two years left to the discretion of the town.

Also, in an effort "to resolve any disputes concerning ownership of buildings or structures without resorting to litigation," the town gave any resident who chose not to enter into a bridge lease "the option of removing any such buildings or structures at [the resident's] own expense."  In all, the town offered bridge leases to 121 residents; of these, 119 accepted, including the Wendell Trust and Touher.  Thereafter, fearing that the town eventually would seek to sell the land and the structures, the Wendell Trust and Touher, along with two

other sets of residents, filed their complaint, seeking a declaration that they owned their homes as personal property. The plaintiffs now appeal from the judgment and from posttrial orders in favor of the town.

2. <u>The Touher and Wendell Trust structures</u>. In 1962, Touher leased an unimproved lot on Conomo Point from the town for seventy-five dollars per year.[7] The next spring he built a small, two-bedroom, one-bathroom cottage. Following the settlement of the Pingree case, with twenty years of leasing guaranteed, he made approximately $120,000 in improvements, adding a master bedroom, a laundry room, and other amenities, nearly doubling the size of the original cottage.

In 1996, David Wendell, as then trustee of the Wendell Trust, paid $175,000 to purchase a "large, impressive three story house" on Conomo Point overlooking the Atlantic Ocean. The town approved the prior owner's transfer of lease rights to the Wendell Trust, as well as Wendell's plans to renovate the house. Wendell has since passed away, but the Wendall Trust continues to hold the lease for the property.

<u>Discussion</u>. "The general rule is that the erection of a building on the land of another makes it a part of the realty."

---

[7] By the time he exercised his option to extend his Pingree lease for the second ten-year period, Touher's annual rent (for calendar year 2002) had increased to $1,236.97, and it would thereafter be adjusted annually to reflect changes in the consumer price index for the city of Boston.

Meeker v. Oszust, 307 Mass. 366, 369 (1940). See Barnes v.
Hosmer, 196 Mass. 323, 324 (1907); Ward v. Perna, 69 Mass. App.
Ct. 532, 537 (2007). An exception applies where "there is an
agreement, express or implied, that the building will remain
personal property and that the owner of the building may remove
it." Ward v. Perna, supra.

The trial judge determined that the homes built and
occupied by the Wendell Trust and Touher were so affixed to the
land as to become the property of the town, and that the town
did not have an express or implied agreement with either of the
plaintiffs that the homes they erected were to remain their
personal property. The plaintiffs challenge both of these
determinations. If they prevail on either, they are entitled to
a declaration that they own the homes. "This is a mixed
question of fact and law," Noyes v. Gagnon, 225 Mass. 580, 584
(1917). But see Bay State York Co. v. Marvix, Inc., 331 Mass.
407, 411 (1954) ("[T]he intent to make [chattel] a part of the
realty may be established as a matter of law . . . but
ordinarily its determination requires a finding of fact");
Consiglio v. Carey, 12 Mass. App. Ct. 135, 138 (1981) ("The
question whether similar items were annexed, and therefore
realty, or unannexed and therefore personalty, has generally
been held to be one of fact"). "The burden of proof is upon
those who claim that it is personal property, to show that it

retains that character."  Madigan v. McCarthy, 108 Mass. 376,

377 (1871).

1.  Existence of an agreement.  Taking certain of the trial

judge's findings out of context, the plaintiffs contend that the

judge actually found "there was an agreement that the residents

owned the structures and the Town owned the land."  The trial

judge did state, "As a general matter, it is fair to conclude

that the residents understood that the Town owned the land and

that the initial, rather simple, cottages that were placed upon

Conomo Point were owned by the residents during the term of the

lease" (emphasis supplied).  The trial judge further found that

the town required the renters to obtain town approval of their

building plans, acquiesced when the lessees occasionally sold

their structures to third parties, and at times referred to the

residents as "homeowners."[8]  The judge acknowledged that "these

_____

[8] We reject the plaintiffs' contention that the town is
estopped from denying that the plaintiffs own their dwellings
because the town took the opposite position in the Pingree case.
To the extent the issue of judicial estoppel was before the
trial judge, he acted within his discretion not to apply the
doctrine here.  See Otis v. Arbella Mut. Ins. Co., 443 Mass.
634, 640 (2005) (decision to bar claim on ground of judicial
estoppel reviewed for abuse of discretion).  The pleadings in
the Pingree case in which the town referred to the residents as
"owners" of their dwellings are documents signed by both parties
by agreement or stipulation as well as a notice of a proposed
settlement issued from the court.  These documents cannot fairly
be characterized as the town "hav[ing] succeeded in convincing
the court to accept its . . . position."  Id. at 641.  Indeed, a
case that ends in settlement does not qualify as "success" for
the purposes of judicial estoppel.  East Cambridge Sav. Bank v.

references evidence some understanding that the residents owned their structures."

Nonetheless, on the pertinent question -- whether there was an agreement that any structure would "retain[] its character as personal property," Duquenoy v. Dorgan, 341 Mass. 28, 29-30 (1960) -- the judge found no express or implied agreement concerning "what would happen to the structure at the end of the lease should it not [be] easily removed from the land, or, in other words, if the structure was affixed to the land. . . . On this issue, there was no meeting of the minds between the Town and the residents." We discern no error in that finding.

The voluminous record is devoid of any express agreement that the Wendell Trust or Touher would own any structures they affixed to the town's land. The plaintiffs point to language repeated in several of their leases to the effect that the town had the option to terminate the lease "in the event that a dwelling house on the said lot during the term of this lease is substantially destroyed by fire or other unavoidable cause or is removed, [if] a dwelling house is not erected within one year after . . . substantial destruction or removal" (emphasis supplied). This language, which essentially makes the removal of a dwelling house a breach of the lease, hardly gives the

Wheeler, 422 Mass. 621, 623 (1996). Chiao-Yun Ku v. Framingham, 53 Mass. App. Ct. 727, 729 (2002).

lessees permission to remove their houses, let alone addresses the status of the houses if they become fixtures.[9]

Nor does the record evidence carry the plaintiffs' burden to demonstrate an implied agreement between the town and the Wendell Trust or Touher that their homes should remain personal property if affixed to the land. "There are dicta in several cases in this Commonwealth that an agreement for the right of removal, or that the buildings shall remain as personal property of him who erects them, may be implied from the fact that they were erected by permission from the owner of the land." Meeker v. Oszust, 307 Mass. at 369. While the town did require formal approval of all the residents' building plans, and did in fact approve the Wendell Trust's renovations and Touher's original construction plans and improvements, this evidence could be taken to mean that the town believed that it would ultimately become the owner of any structures that were affixed to town land. In any event, we need not decide whether an agreement that the plaintiffs would own any affixed structures can be implied from the town's approval of the plaintiffs' construction

_____

[9] By contrast, when Touher sought financing to build the original cottage, he granted a security interest in the cottage to the lender. The security agreement -- to which the town was not a party -- recited that "by terms of a lease between the borrowers and the Town of Essex, . . . the cottage building is to remain personal property and not to become a part of the real estate." This was not an accurate recital of any term of the lease, but it demonstrates both the importance of an express agreement (at least to the lender), and how to draft one.

or renovation plans. The trial judge found there was no such agreement. As we discern no error of law or fact, the trial judge's findings must stand. See id. at 372; Cavazza v. Cavazza, 317 Mass. 200, 202 (1944).

2. Fixtures. In the absence of an agreement to prevent the application of the general rule, the question remains whether the Wendell Trust and the Touher places are fixtures or personal property. If "chattel has been so affixed that its identity is lost, or so annexed that it cannot be removed without material injury to the real estate or to itself," Stone v. Livingston, 222 Mass. 192, 194-195 (1915), then its character as part of the realty "may be established as a matter of law," Bay State York Co. v. Marvix, Inc., 331 Mass. at 411. Conversely, "articles which are manifestly furniture as distinguished from improvements" are personal property. Stone v. Livingston, supra at 195. See Consiglio v. Carey, 12 Mass. App. Ct. at 139 (removal of chattel permitted where removal "causes no material injury to the estate, and where the thing can be removed without losing its essential character or value as a personal chattel").

In the middle lie those cases in which the "intention [of the party who attached the property] is the controlling fact and where such fact is to be determined upon consideration of all the circumstances, including therein the adaptation to the end

sought to be accomplished and the means, form and degree of annexation."  Stone v. Livingston, supra.  "It is not [the affixing party's] undisclosed purpose which controls, but his intent as objectively manifested by his acts and implied from what is external and visible."  Bay State York Co. v. Marvix, Inc., supra.[10]

The trial judge found that "Touher's expanded home is indeed affixed to the land."  It is built on concrete walls, with a large fireplace and a concrete patio, all of which are attached to the bedrock.  Touher himself testified that the house was "not built to be moved."  The judge found that "[t]he original portion of the Touher home cannot be separated from the new addition without very substantial damage to the home," and that "the remaining concrete foundation and patio could not easily be removed."

---

[10] Thus, looms in a textile mill, each weighing more than one ton, and fastened to the floor by screws to keep them from "wabbling" [sic] and moving around, were chattel and not fixtures, as "the machines were not especially designed for use upon the premises, were not peculiar in their pattern, were easily removable without injury to themselves or to the structure in which they were placed, [and] were equally adapted for use in any other worsted mill."  Stone v. Livingston, supra at 193, 195.  By contrast, a building "of large dimensions, so constructed that it could not be removed from the premises without a change in its structure at great cost; . . . built on stone foundations, partly natural and partly artificial, to which it was fastened by iron bolts; [with] a brick furnace and chimney, also resting on a base set in the ground," was a fixture.  Talbot v. Whipple, 14 Allen 177, 181 (1867).

With respect to the Wendell Trust home, the judge observed, "It would be difficult to conceive of anyone building such a substantial three story structure with the intent to later move it." It is affixed to the land "by a series of brick pilings and with a small brick basement which goes into the land and apparently rests upon bedrock," and is attached to two water cisterns. The cisterns would have to be removed, and the brick cellar, dug into the ground, would remain if the structure were moved.

The judge accepted the plaintiffs' expert's testimony that either of these structures could hypothetically be moved, and that it would be possible to repair the significant damage that would be done to the property, although the judge noted that such a process would likely damage the structures as well. We disagree with the plaintiffs' contention that the evidence supports only the conclusion that "both can be moved without material damage to the land or the homes." The judge properly considered all the relevant factors, and his ultimate conclusion that the structures are affixed to the land is neither wrong as a matter of law nor clearly erroneous as a matter of fact. "It is difficult to see in what manner a building could be more effectually annexed to the realty than the [two] in controversy." Talbot v. Whipple, 14 Allen 177, 181 (1867).

3.  Unjust enrichment.  Finally, the Wendell Trust and Touher argue that the trial judge erred in rejecting their claims that they are entitled to recover the value of their homes under a theory of unjust enrichment.  While we, like the trial judge, have "some sympathy with that argument," the judge did not err.  He correctly distinguished the plaintiffs' claim from the circumstances of Ward v. Perna, 69 Mass. App. Ct. at 538-540, where the tenants made improvements to their cottage, affixing it to the land, as a result of a misrepresentation that they would be given the opportunity to buy the underlying land.

The town asserts that "[o]ne cannot, merely by erecting a house on the land of another, compel him to pay for it, even if the land is benefited by the erection of the structure." Salamon v. Terra, 394 Mass. 857, 860 (1985), quoting from O'Conner v. Hurley, 147 Mass. 145, 148 (1888).  This principle does not apply in full force here, as the plaintiffs' homes were built under agreements with the town.  "[W]hen one has come into possession by license or contract, the relative rights and obligations of the parties may be adjusted, and in legal contemplation are taken to be adjusted and regulated by the terms of the contract."  Mason v. Richards, 15 Pick. 141, 143 (1833).

Here, Touher built and the Wendell Trust bought their homes with eyes wide open, and in the light of the well-established

rule that the erection of a building on the land of another makes it a part of the realty.  They enjoyed the use of the land and the dwellings for many years; indeed, they continue to do so today.  While a claim of unjust enrichment may not require fraud or misrepresentation, in the circumstance of this case, it cannot be said that the town's retention of the structures is "against the fundamental principles of justice or equity and good conscience."  Ward v. Perna, supra at 540 n.11, quoting from Santagate v. Tower, 64 Mass. App. Ct. 324, 329 (2005).

Judgment affirmed.

Orders denying motions to alter or amend judgment, or for a new trial or amendment of judgment, affirmed.